

## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF VIRGINIA
#### Richmond Division

|  |  |
|---|---|
| Paul Goldman, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 3:21-CV-420 |
| Robert Brink, *et al.*, | ) |
| Defendants. | ) |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS AND MEMORANDUM IN SUPPORT

Paul Goldman
*Pro se*
P.O. Box 17033
Richmond, Virginia 23226
804.833.6313
Goldmanusa@aol.com

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................... 1

TABLE OF AUTHORITIES............................................................................................. 2

THIS CASE BY THE NUMBERS................................................................................... 5

THIS STATISTICAL CASE IN A NUTSHELL........................................................... 10

DEFENDANTS' CASES ANALYZED.......................................................................... 11

DEFENDANTS' QUESTIONABLE ARGUMENT...................................................... 12

THREE-JUDGE COURT SHOULD RULE ON STANDING...................................... 13

PLAINTIFF HAS STANDING....................................................................................... 14

    I. Defendants Have Conceded Plaintiff's Standing.................................................. 14

    II. *Baker v. Carr* Standing...................................................................................... 16

    III. Plaintiff Has a Federal Constitutional Right to a 2022 Election...................... 17

    IV. The Pandemic is No Excuse to Eradicate Constitutional Rights..................... 18

    V. Defendants' Reliance on *Garcia* is Baffling.................................................... 18

    VI. *Gill v. Whitford* Helps, Not Hurts Plaintiff.................................................... 20

    VII. The "Under the Ideal" Mathematical Malarkey of Defendants..................... 21

    VIII. Voter vs. Registered Voter vs. Resident...................................................... 22

    IX. Candidate Standing......................................................................................... 24

    X. *Cosner* Relief is Appropriate.......................................................................... 24

    XI. June 2022 Primary is Irrelevant...................................................................... 25

    XII. Moot? Actually, Plaintiff's Particularized Constitutional Harm Grows Daily......... 25

ORAL ARGUMENT IS NECESSARY......................................................................... 29

CONCLUSION............................................................................................................... 29

## TABLE OF AUTHORITIES

**Cases**

*Baker v. Carr,*
369 U.S. 186, 204 (1962)..................................................................................... 16, 27

*Brown v. Thomson,*
462 U.S. 835 (1983)............................................................................................. 14, 15

*Bush v. Gore,*
531 U.S. 98 (2000)..................................................................................................... 19

*Cosner v. Dalton,*
522 F. Supp. 350 (E.D. Va. 1981)............................ 5, 6, 7, 8, 9, 10, 13, 15, 17, 18, 24, 25, 27, 28

*Cosner v. Robb,*
541 F. Supp. 613 (E.D. Va. 1982)...................................................................................... 5

*Evenwel v. Abbott,*
136 S. Ct. 1120. 1133 (2016)........................................................................................... 23

*Ex parte Milligan,*
71 U.S. 2 (1866)................................................................................................... 11, 18

*Farley v. Patterson,*
493 F. 2d 598 (5th Cir. 1971)......................................................................................... 12

*Favors v. Cuomo,*
866 F. Supp. 2d 176, 187 (E.D.N.Y. 2012)........................................................................... 24

*Franklin v. Krause,*
32 N.Y.2d 234 (1973)................................................................................................. 12

*League of Women Voters of Nassau County v. Nassau County Board of Supervisors,*
737 v. F2 155 (2nd Cir. 1984)......................................................................................... 12

*Garcia v. 2011 Legislative Reapportionment Comm'n,*
559 Fed. Appx. 128 (3d Cir. 2014).................................................................................... 18

*Gill v. Whitford,*
138 S. Ct. 1916 (2018)........................................................................................ 19, 20, 21

*Harris v. Arizona Independent Redistricting Commission,*
136 S. Ct. 1301, 1305 (2016)..................... 5, 7, 8, 9, 10, 11, 12, 15, 17, 20, 21, 22, 25, 26, 27

*Harris v. McCrory*,
159 F. Supp. 600, 627 (Dist. Ct. MD. N. Car. 2016)..................................................... 9, 17

*Kirkpatrick v. Preisler*,
394 U.S. 526 (1969)..................................................................................................... 22

*Mahan v. Howell*,
410 U.S. 315 (1973)........................................................................................ 7, 8, 10, 15

*Marbury v. Madison*,
5 U.S. 137 (1803)......................................................................................................... 10

*Meyer v. Grant*,
486 U.S. 414 (1988)..................................................................................................... 19

*Page v. Virginia State Board of Elections*,
58 F. Supp 3d 544, 559 (E.D. Va 2014)....................................................................... 24

*Reynolds v. Sims*,
377 U.S. 533 (1964)...................... 5, 6, 7, 9, 10, 15, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 29

*Skolnick v. Board of Commissioners of Cook County*,
435 F. 2d 361 (7th Cir. 1970)....................................................................................... 12

*Shapiro v. McManus*,
136 S. Ct. 450 (2016).................................................................................................... 14

*Swann v. Adams*,
385 U.S. 440, 444 (1967).............................................................................................. 15

*Williams v. Rhodes*,
393 U.S. 23 (1968)....................................................................................................... 24

**Constitutional Provisions**

U.S. Const. Amd. XIV............................................................................................ 7, 19, 24, 25

Va. Const. art. II § 6........................................................................................................ 19

Va. Const. art. IV § 3........................................................................................................ 5

Pa. Const. art. II § 17...................................................................................................... 19

**Statutes**

Va. Code Section 24.2-405................................................................................................... 22

Va. Code Section 24.2-520................................................................................................... 24

## THIS CASE BY THE NUMBERS

"Overweighting...of those living here has the certain effect of dilution...of those living there," the Court declared. *Reynolds v Sims*, 377 U. S. 533, 566 (1964). It is unconstitutional and moreover, the "resulting discrimination...is *easily demonstratable mathematically*." Id. (Emphasis added).

The calculations required are basic addition, subtraction, and division, often expressed in simple percentages. See, e.g, *Cosner v. Dalton*, 522 F. Supp. 350, 359 (E.D.Va. 1981) (three-judge court). The year following, in *Cosner v. Robb*, 541 F. Supp. 613 (E.D. Va. 1982) (three-judge court), the Court said "in *Cosner v. Dalton*...we held...the variance in the population of the districts, **26.63%**, was too great to meet the requirements established in *Reynolds v. Sims*." Id. at 615.

The statistical evidence below is based on the stipulation of facts. ECF 73.

**26.63%**: This referred to the variance in population, expressed in percentage terms, between the least populated House of Delegates district and the most populated district in the 1981 apportionment scheme deemed unconstitutional. The Virginia House of Delegates has long had 100 members due to Article IV, Section 3 of the Constitution of Virginia. In a *Reynolds* case, this variance between the least and most populated districts is generally called the "maximum population deviation" in the proposed scheme and is expressed in percentage terms. *Harris v. Arizona Independent Redistricting Commission*, 136 S. Ct. 1301, 1305 (2016) (the leading case on permissible variance). Some courts use "maximum population variance." *Cosner* used both interchangeably: compare Id. at 355 with 359.

The easiest way to calculate this percentage is to first subtract the population of the least populated district from the population of the most populated district. Then divide the remainder by the population of the ideal district in the U.S. Census used to create the districts in the challenged apportionment scheme. What is the ideal district? In Virginia, the House of Delegates has long had 100 members. Thus, in *Cosner v Dalton*, the population of the ideal district was the total state population in the 1980 U.S. Census used to create the challenged apportionment plan divided by 100. Id. at 355. The resulting number is the population for the ideal district. This ideal district does not actually exist; it is merely a mathematical tool.

But most courts use a different method although the resulting percentage figure is the same. Thus, in *Cosner v. Dalton,* the Court initially made two separate calculations. It calculated the numerical population difference between the least populated district and the ideal district population, and the population difference between the most populated district and the same ideal district. Then each remainder was divided by the ideal district population. This produced two separate deviations expressed in percentage terms. The two percentage numbers were then added together. The combined result was **26.63%**, the "maximum population deviation" or "maximum population variance" of the scheme. In *Reynolds* litigation, this maximum deviation or variance is the key metric in determining whether a challenged scheme is unconstitutional.

**78.4%**: This is the maximum population deviation (variance) in the apportionment scheme used on November 2, 2021, to elect the Virginia House of Delegates. These old districts were created pursuant to the 2010 U.S. Census (in this Response, the term "old" refers to those districts created pursuant to the 2010 U.S. Census, and the term "new' refers to districts created by the Supreme Court of Virginia on December 28, 2021, pursuant to the 2020 U.S. Census). The old House District 87 ranked as the most populated with **130,192** inhabitants. Old House

District 75 ranked as the least populated with **67,404** inhabitants. ECF 73. This calculates to a **78.4%** maximum population deviation.

**72.7%**: Using, *arguendo*, the ideal district population from the 2020 Census, the maximum population deviation between old House District 87 and old House District 75 is **72.7%**.

**300%**: Therefore, whether using **78.4%** or **72.7%**, the maximum population deviation in the 2021 Virginia election scheme approaches **300%** greater than what *Cosner v. Dalton* declared "facially unconstitutional." Id. at 359.

**16.4%**: When *Cosner v. Dalton* was decided, the leading case on the permissible maximum population deviation in Virginia had been *Mahan v. Howell*, 410 U.S. 315 (1973). *Mahan* declared **16.4%** as the top maximum population deviation likely tolerable under the 14th Amendment. Id. at 329.

**4X**: Even a **72.7%** deviation is over **four times** the deviation allowed in *Mahan*. **78.4%** is nearly five times.

**10%**: In 2016, *Harris v. Arizona Independent Redistricting Commission*, 136 S. Ct. 1301, 1305 (2016) set 10% as the statistical fault line for population deviation analysis. If the "maximum population deviation" is less than **10%**, then plaintiffs "will succeed only rarely, in unusual cases." Id. at 1307. Conversely, deviations breaching 10% are considered constitutionally suspect and are only allowable if the state can factually prove it made the good faith effort to avoid such extremes required in *Reynolds v. Sims*. Id. at 577.

**700%**: Whether **72.7%** or **78.4%** is used, this is **700%** greater than the statistical default line in *Harris*.

7

**22.4%**: Employing the new stipulated facts, the population deviation (variance) between Plaintiff's old House District 68 and the old House District 75, the least populated district at the time of the November election, is **22.4%** based on the ideal district population for the 2010 U.S. Census used in creating the districts.

**22.13%**: Because the **26.63%** variance included special consideration for the Eastern Shore, the Court in *Cosner v. Dalton* tried to save the proposed scheme by calculating the maximum population deviation without the "geographically isolated…Eastern Shore counties." But this still left a maximum population deviation of "22.13%" far above *Mahan*. Id. at 356. The proposed scheme remained facially unconstitutional. Id. at 358 and 361. "Our decision does not hinge on which method is used," the Court said. Id. at 358.

**20.8%**: Even using, *arguendo*, the ideal district population in the 2020 U.S. Census not used to create the districts still produces a population deviation between the old House District 68 and the old House District 75 of **20.8%**.

**2X**: Therefore, using either **22.4% or 20.8%,** the deviation is more than **two times** the 10% fault at which a state legislative apportionment scheme becomes constitutionally suspect. *Harris* at 1307.

**20**: The number of House of Delegate districts in the facially unconstitutional 1981 scheme with a population deviation greater than 5% from the ideal district. *Cosner v. Dalton* at 359.

**68**: The number of House of Delegates districts contested on November 2, 2021, having a population deviation greater than 5% from the ideal district population using the census data creating the 100 districts.

**1.24 to 1:** The unconstitutional maximum population ratio determined by *Cosner v. Dalton* to exist between the most populated and the least populated districts even excluding the Eastern Shore. Id. at 359.

**1.27 to 1:** The population ratio between Plaintiff's old House District 68 and old House District 75 on November 2, 2021.

**1.93 to 1:** The population ratio between the most populated old district and least populated old district on November 2, 2021.

**48.9%:** The apportionment scheme rejected in *Cosner* required only **48.9%** of the population to elect a majority of the delegates. Id. at 359.

**47.7%:** In the instant matter, **47.7%** of the population can elect 51 delegates.

*Cosner v. Dalton* states "Virginia's citizens are entitled to vote as soon as possible for their representatives under a constitutional apportionment." Id. at 364. In accord: then Justice Roger Gregory's majority opinion in *Harris v. McCrory*, 159 F. Supp. 600, 627 (M.D. N. Car. 2016). *Cosner v. Dalton* warned against using in the 1981 election the "1971 [old districts drawn to the 1970 U.S. Census] …because Virginia's population had grown…(such) growth unevenly spread throughout the Commonwealth. **Allowing elections to proceed under the 1971 Act would greatly disadvantage the citizens in Virginia's rapidly growing areas (doing) great harm to the principle of one-person, one-vote.**" Id. at 363. (Emphasis added).

Since *Reynolds*, no Virginia House of Delegates election in a reapportionment year (2021 is such a year) has been held using the old districts. Moreover, never before in Virginia history (and one suspects U.S. history), has a state legislature convened to start a session and faced the situation confronting the 2022 House of Delegates: to wit, every member had been elected on

November 2, 2021, in old districts declared no-longer valid by the Supreme Court of Virginia on December 28, 2021. This means no Delegate now represents a legal district under Virginia law.

*Reynolds* said the appropriate remedy should be rooted in historical equitable principles. Id. at 584. "What is marginally permissible in one state may be unsatisfactory in another, depending on the particular circumstances of the case." Id. at 578. In that connection, Chief Justice John Marshall in *Marbury v. Madison,* 5 U.S. 137 (1803) offered timeless advice:

"(Ours)… has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the vindication of a vested legal right." Id. at 163.

## THIS STATISTICAL CASE IN A NUTSHELL

At all times, Defendants knew or can be presumed to have known:

(a) The **10%** constitutional default marker in *Harris v. Arizona, supra,* for state legislative apportionment schemes.

(b) Anything over **16.4%** would never be tolerated. *Mahan.*

(c) **22.13%** had been deemed facially unconstitutional in *Cosner v. Dalton.*

(d) A population ratio of **1.24 to 1** between the district with the least population and the largest population, irrespective of the population of an ideal district, had been declared *per se* unconstitutional. Id.

(e) Based on the population data cited in the Complaint, it was clear in June that using the old districts to conduct the 2021 House of Delegates elections would run afoul of the warning in *Cosner v. Dalton.* Id.

**(f)** The population ratio in the instant matter is **1.27 to 1** between the Plaintiff's old House District 68 and old House District 75.

**(g)** The population deviation between Plaintiff's old House District 68 and old House District 75 is **double** that considered constitutionally suspect in *Harris v. Arizona.*

Plaintiff merely sought the fair, equitable, and easily executed remedy considered to be in the best interest of the people of Virginia 40 years ago by Republican and Democratic Governors, Republican and Democratic Attorneys General, and a State Board of Elections in both Republican and Democratic Administrations.

Defendants claim the consequences of the COVID pandemic justify holding the election using old districts with population variances universally considered facially unconstitutional without seeking the order of any Court, indeed without at least a formal opinion of the Attorney General. They further claim the right to continue this harm to the constitutional rights of Plaintiff and those similarly situated until 2024 – a power even President Abraham Lincoln never claimed. *Ex parte Milligan,* 72 U.S. 1 (1866).

As in 1982, the time to implement the same remedy readily embraced by bipartisan state leadership remains.

## DEFENDANTS' CASES ANALYZED

Defendants cite a staggering total of 77 cases for this *pro se* Plaintiff to review. Plaintiff read them all. Given the word limit in Rule Local 7(f)(3), it is only possible to discuss a few. But what stands out to Plaintiff is not the cases cited but rather the case not cited by Defendants: *Harris v. Arizona Independent Redistricting Commission,* the leading U.S. Supreme Court case on permissible population deviations in a state legislative apportionment scheme.

11

Defendants instead cite *League of Women Voters of Nassau County v. Nassau County Board of Supervisors*, 737 v. F2 155 (2nd Cir. 1984). As the Court points out, "Nassau County is governed by a Board [that uses] a weighted voting system" unlike anything used in any state legislative scheme in America. It said their decision is "controlled" by *Franklin v. Krause*, 32 N.Y.2d 234 (1973) Id. at 156. In *Krause*, the court found this weighted voting system lawful, hinting in the future the Supreme Court might "not demand strict one man, one vote principles at the local level." Id. at 242, fn. 1.

*Skolnick v. Board of Commissioners of Cook County*, 435 F. 2d 361 (7th Cir. 1970) is similar in that the "number of commissioners is not required to be apportioned between the two districts by population." Id. at 364. Finally, *Farley v. Patterson*, 493 F. 2d 598 (5th Cir. 1971) revolved around the governing Board of Supervisors in Forest County, Mississippi. The Black plaintiffs challenged county officials excluding local college students for purposes of reapportionment. Id. at 600.

These are fascinating locally rooted cases from other Circuits. But, if germane at all, they are significantly less germane than *Harris* on permissible deviations in a state legislative scheme.

## DEFENDANTS' QUESTIONABLE ARGUMENT

In describing Plaintiff's lawsuit, Defendants said the "only appropriate remedy, he (Goldman) contended, would be a federal injunction dissolving the House of Delegates and declaring a special election for November of 2022." Def. Mem. P.4. This is simply not true, indeed this apparently long-whispered canard had been specifically debunked at the October 12, 2021, hearing.

The Court to Mr. Goldman: " I just want to confirm that the relief you are asking for is essentially *Cosner* relief. You're not asking to enjoin the election." JA 079.

Mr. Goldman: "Yes" Id.

The Court: "Okay. You don't want an injunction...**I haven't seen that in your papers** and you're not asking for it? Id. (Emphasis added).

Mr. Goldman: "I don't know why anybody would say that. You're correct." Id. at 69 and 70.

With all due respect, a *pro se* litigant should not be required to endure from not one but two Attorneys General and their staff continued "irresponsible" legal conduct. JA 078. The protection of the constitutional rights guaranteed by the Equal Protection Clause is a matter of the upmost seriousness.

## THREE-JUDGE COURT SHOULD RULE ON STANDING

Defendants' claim "(f)ollowing the October 12, 2021, hearing, and before the jurisdictional issues were addressed, Chief Judge Gregory convened a three-judge panel." Def. Mem. P.9. This is highly misleading. Chief Judge Roger Gregory acted upon a request from Judge Novak. ECF 44.

Had Defendants believed Judge Novak had incorrectly requested the panel, they had the right to file such a motion. They did not. Indeed, at the hearing, Defendants suggested a panel would be needed to hear the standing issue. JA 106.

At the October 12 hearing, the Court asked: "Mr. Goldman...is there anything else you want to say?"

13

Mr. Goldman: "(T)here are people that would like to intervene." Id. at 119 and 120.

Judge Novak's subsequent Order allowed ample time for intervenors. He set back oral argument on standing to accommodate intervenors. ECF 41. But the three-judge court later blocked intervention. ECF 49.

At the March 21, 2022, hearing, Judge Novak said the Order of Remand still blocked intervenors. ECF 74. Plaintiff respectfully disagrees. But if accurate, logic then says the 4th Circuit must believe a three-judge court should decide standing. Otherwise, logic suggests they would have remanded back to Judge Novak to pick up where he had left off before Defendants appealed his Order.

Judge Novak said at the October 12, 2021, hearing Plaintiff had raised serious issues of law. JA 078. *Shapiro v. McManus* 136 S. Ct. 450 (2016) suggests this triggers the three-judge court favored by congressional policy. Chief Judge Gregory was right, and he properly convened the panel to fully resolve all the issues in this matter.

## PLAINTIFF HAS STANDING

### I.    Defendants Have Conceded Plaintiff's Standing

Trying to salvage their sovereign immunity appeal, Defendants said to the 4th Circuit "...even if Goldman were correct that the relevant injury analysis was whether an individual lived in a district with a population deviation exceeding lawful limits, he would still not have standing. Even under his theory, his district had a population deviation only 6.5% above the ideal district. The Supreme Court has indicated that a deviation of less than 10% is prima facie constitutional. See *Brown v. Thomson,* 462 U.S. 835, 842 and 843 (1983)." Appellants Reply Brief, P. 9.

This badly misreads *Brown* as Plaintiff pointed out in Oral Argument to the 4th Circuit. The correct reading of *Brown* is found in *Harris*:

"Because the maximum population deviation between the largest and the smallest district is less than 10%, the appellants cannot simply rely upon the numbers to show that the plan violates the Constitution. See *Brown v. Thomson*." *Harris* at 1305. Thus, the 10% is not 10% more than the ideal district population but a 10% or more population deviation between the actual districts at issue. See, e.g, *Cosner v Dalton*.

While wrong on *Brown*, Defendants are right in using the ideal district population in the 2010 Census for the deviation percentage calculations (the right percentage is now 5.7% given the stipulation). Defendants apparently missed the following citation in *Brown* quoting *Swann v. Adams*, 385 U.S. 440, 444 (1967): " variations of…40% among house districts can hardly be deemed de minimis and none of our cases suggests that differences of this magnitude will be approved" without satisfying the good faith requirement of *Reynolds*. *Brown* at 843. (*Swann* predates *Mahan* by six years). Accordingly even *Brown*, a favorite case of Defendants, concedes a 72.7% variance is unconstitutional. Moreover, by conceding the old House District 68 had a population 6.5% above the ideal, they likewise concede old House District 75 had a deviation of 15.7% from the ideal district population. This equates to a combined percentage deviation more than **double** *Harris*, significantly above *Mahan,* and slightly over what *Cosner* found facially unconstitutional.

Indeed, Defendants' claim that Plaintiff needed to be in a district with a population at least 10% greater than the ideal district to have standing has ironically trapped Defendants. Why? Because they admit individuals in such districts have standing. Their claim lacks legal

support since it means the combined population deviation in one of the old districts contested on November 2, 2021, would need to be at least 25.7% (10% plus 15.7%) to afford standing.

But let's assume, *arguendo*, it is correct. This would mean a Plaintiff would need to reside in an old district last November with a population of at least 94,946 to have standing even if we use the ideal district population of the 2020 U.S. Census (86,314 x 1.10).

Defendants thus conceded an interested Plaintiff in the following old Districts suffered sufficient constitutional harm last November to have standing to survive a Motion To Dismiss: old House District 2 (96,224 population), District 10 (104,692), District 13 (101,230), District 32 (101,629), District 33 (96,362), District 52 (96,930), District 65 (98,655), District 87 (130,192), and District 88 (102,556). These Districts had a total combined population of 928,470.

And yet: the Attorney General and Defendants, sworn to ensure the integrity of our electoral process, have felt no obligation to protect the voting rights of these Virginians nor the rights of other millions harmed but whose harm they fail to recognize.

## II.   *Baker v. Carr* Standing

The Supreme Court explained standing in these words in the seminal case on legislative apportionment:

"Have the appellants alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness…the court so largely depends for illumination of difficult constitutional questions? ***This is the gist of the question of standing.***" *Baker v. Carr*, 369 U.S. 186, 204 (1962) (Emphasis added).

"The complaint was filed by residents…[e]ach is a person *allegedly qualified to vote* for members of the General Assembly." Id. (Emphasis added).

"Their constitutional claim is…the [state reapportionment law] constitutes arbitrary and capricious state action, offensive to the Fourteenth Amendment." Id. at 207.

"They are asserting a plain, direct, and adequate interest in maintaining the effectiveness of their votes (citation omitted)." Id. at 208.

"They are entitled to a hearing and to the District Court's decision on their claims." Id.

Plaintiff meets these tests.

### III.   Plaintiff Has a Federal Constitutional Right to a 2022 Election

*Cosner v. Dalton* states "Virginia's citizens are entitled to vote as soon as possible for their representatives under a constitutional apportionment plan." Id. at 364. In accord: *Harris v. McCrory, supra*. Surely Plaintiff, residing in a district that Defendants concede has a population deviation far greater than 16.4% marker is such a citizen.

*Reynolds* says a failure to seat a reapportioned legislature more than 10 years after the 2011 election is "constitutionally suspect." Id. at 583. Why 10 years? This case explains the reason. As early as 2017, the citizens in areas like Loudoun County had already suffered a violation of their constitutional right to equal representation due to the rapid population growth cited by Plaintiff in his Complaint. JA 012. "(W)e do not mean to intimate that more frequent reapportionment would not be constitutionally permissible," said *Reynolds*. Id. at 584. "But if reappointment were accomplished with less frequency, it would assuredly be constitutionally suspect." Id.

17

*Reynolds* says: we know populations in growing areas are constitutionally disadvantaged long before the Census is done. The Census does not create the harm, it merely documents the problem mathematically. Those nine districts even Defendants conceded had hugely grown since the last Census did not magically lose their equal representation rights last August only when the new Census data arrived in Richmond. This is why the unconstitutionality needs to be fixed as soon as possible.

## IV.   The Pandemic Is No Excuse to Eradicate Constitutional Rights

According to *Ex parte Milligan*, 71 U.S. 2 (1866), it is doubtful even President Lincoln had the powers claimed by Defendants. Defendants say the pandemic allowed them to not only violate the federal Constitution without seeking any judicial approval but also continue doing so until 2024. Whatever excuse the pandemic may have provided for the Defendants' actions in 2021, it is not justification for refusing the fix the harm this coming November.

## V.   Defendants' Reliance on *Garcia* is Baffling

Defendants claim *Garcia v. 2011 Legislative Reapportionment Commission*, 938 F. Supp. 2d 542 (E.D. Pa. 2013), a single-judge case in another district, trumps the leading three-judge case of *Cosner v. Dalton* in their own circuit. This is baffling, particularly given *Garcia* actually helps Plaintiff.

In *Garcia*, the Pennsylvania Supreme Court ordered state officials to hold the legislative elections under the old districts from the old Census until new districts were enacted into law. Id. at 545. *Cosner* ordered Virginia officials to use admittedly unconstitutional districts for the 1981 House of Delegates election. Id. at 363.  As *Reynolds* stated, "under certain circumstances, such

18

as where an impending election is imminent…equitable considerations might justify a court withholding…immediately effective relief in a legislative apportionment case." *Reynolds* at 585.

Furthermore, the Constitution of Pennsylvania does not require an election using new districts occur on a specific date. Constitution of Pennsylvania, Article II, Section 17. But the Virginia's does. Article II, Section 6.

Thus, *Meyer v. Grant,* 486 U.S. 414 (1986) and *Bush v. Gore,* 531 U.S, 98 (2000*)* do not apply in the Keystone state. But they do in Virginia. *Meyer* at 424 and *Bush* at 103, 104, and 105 stand for the proposition that once a state chooses to give its citizens a vested voting right, this right is now federally protected by the 14th Amendment from denigration by state officials. The *Meyer* decision specifically says once a state granted in its state constitution such a core political right, it made no difference the state had done this voluntarily. Once granted, "the State was obligated to do so in a manner consistent with the Constitution" of the United States. *Meyer* at 420. *Bush* likewise said a state voting right, once granted, had federal constitutional protection.

## VI.   *Gill v. Whitford* Helps, Not Hurts, Plaintiff

If *Gill v. Whitford*, 138 S. Ct. 1916 (2018) is so helpful to Defendants, why did Defendants misstate a key part of the opinion? Defendants say the following:

"*Gill* instructs courts to compare the plaintiff's *district* to a "hypothetical" *district* …which, in a malapportionment case, is the "ideal" district." Def. Mem, P. 17.

Yet the word "ideal" is **not** found in *Gill.* There is no "ideal" district analysis because *Gill* is a "partisan gerrymandering" case, not a *Reynolds* case. Id. at 1941. Defendants should have asked themselves: if *Gill* is a *Reynolds* case, where is the "maximum population deviation" analysis?

*Gill* said the District Court set out a three-part test for "identifying unconstitutional (partisan) gerrymanders." Id. at 1925. First, is the plan "intended to place a severe impediment on the effectiveness of the voters of individual citizens on the basis of their political affiliation." Id.

We can stop there: this is not a consideration in a *Reynolds* challenge. Hopefully, the following explanation shows the reason Defendants' attempt to read an "ideal" district *Reynolds* dilution analysis into *Gill* is misplaced.

Assume this is 2031 and Virginia has to draw 100 new House of Delegates districts. Assume Virginia has a population of 10,000,000. Thus, the "ideal" House district population is 100,000. Assume **you** are a partisan Republican living in an area of 200,000. Democrats control the reapportionment process. Assume redistricting puts **you** in District X with a 100,000 population. Assume District Y next door also has the perfect 100,000 population.

Assume crafty Democrats creating these 100 districts made sure the population of the least populated district is 97,500 and the population of the most populated is 102,500. Thus the "maximum population variance" is 5%. *Harris* says no one has a *Reynolds* challenge.

However: you **might** have a partisan gerrymandering claim. Assume the 200,000 people in your area consist of 140,000 Republicans and 60,000 Democrats. The Democrats put 100,000 Republicans into your District X. Next door in District Y, they put the remaining 40,000 Republicans and all 60,000 Democrats. While perfect *Reynolds* districts, they might be unconstitutional partisan gerrymanders created to dilute the effectiveness of potential Republican voters like you. Your *Gill* argument: **you** were packed into District X in order to have your vote

wasted on a GOP candidate certain to win in order to create District Y allowing a Democrat to win. Id. at 1924.

Accordingly the "dilution" of your individual district specific vote in a partisan gerrymandering case is based on the unconstitutionality of "packing" you for partisan reasons into your district, not the "dilution" of your vote on the basis of unequal population deviations. See *Harris*. As a legal theory, political gerrymandering is plausible. But as *Gill* points out, it lacks the easily demonstrable mathematics of the *Reynolds* claim. Id. at 1934.

## VII.   The "Under the Ideal" Mathematical Malarkey of Defendants

Defendants cite no case that explicitly discusses, much less supports, their theory that *Reynolds* has an asterisk: to wit, the equal representation principle does not apply if a citizen lives in a district with a population less than the ideal district population no matter how great the dilution of his vote might be due to the population difference between citizens in other parts of the state. A moment's statistical reflection shows the inherent mathematical malarkey.

Let us assume, as in this instant matter, Plaintiff is in House District A with a population of 85,344. District B is the least populated with 42,672 inhabitants. The ideal district population is 86,314. Thus, the population variance or deviation is 2 to 1, singled out as unconstitutional in *Reynolds*. Id. at 562. In effect, as *Reynolds* would say, one resident of the smallest district is equal to two residents of House District 68 for purposes of legislative representation math.

But according to Defendants, Plaintiff would have suffered no constitutional harm because his district is below the ideal district population. This defies 58 years of jurisprudence since *Reynolds*. As *Reynolds* warned, "(o)ne must be ever aware that the Constitution forbids 'sophisticated as well as simple minded modes of discrimination'(citations omitted)." Id. at 563.

The unconstitutional discrimination in the Defendants' misuse of the ideal district population as marker is even more dramatic by using their claim that only individuals in a district with a population of at least 94,945 (86,314 x 1.1) would have standing to sue.

Assume the following plan is enacted: the most populated district was 92,000, the least populated again has 42,672, Plaintiff's district again has 85,344, and the ideal district again is 86,314. According to Defendants, no one would have standing to sue since most populated district is only 6.6% above the ideal, short of their alleged 10% number.

And yet, according to *Harris*, the "maximum population deviation" in this plan is a whopping **57.1%.** Put another way: this scheme has a maximum population deviation nearly 600% greater than *Harris* said made the scheme constitutionally suspect. But Defendants claim *Reynolds* would give no one standing.

"Equal representation for equal numbers of people is a principle designed to prevent debasement of voting power and diminution of access to elected representatives" is the *Reynolds* principle declared in *Kirkpatrick v Preisler*, 394 U.S. 526, 531 (1969).

## VIII.   Voter vs. Registered Voter vs. Resident

Defendants' claim they do not know Plaintiff voted in 2021 (Plaintiff did vote as stated in his Affidavit). Actually, Defendants have known, or should have known, that Plaintiff voted in the 2021 election as this information is contained in the voter history found in the statewide voter list in the unique possession of the Department of Elections. They sell the information for profit. Va. Code Section 24.2-405. But more importantly, a Plaintiff's status as a voter is not a requirement as Justice Thomas has pointed out.

His concurring opinion in *Evenwel v. Abbott*, 136 S. Ct. 1120. 1133 (2016) is worth reading. He is no fan of *Reynolds*. He correctly points out the Supreme Court has often been imprecise in *Reynolds* cases, sometimes suggesting the "right of eligible voters," and sometimes "all individuals within a district...voters or not...have an equal share of representation." Id. at 1133.

His point is well taken. *Reynolds* however does state the equality principle is based on equality of population between districts. Thomas says other matrices such as total register voter population should be considered. That is for another day.

Moreover, the key "vote" in a *Reynolds* challenge is the "vote" cast by one's legislative representative. We all have an equal right to an equal voice in the affairs of our government. But unlike in an election, our voice is implemented indirectly through a representative on the floor the House of Delegates.

This is why the *Reynolds* population equality principle does not require anyone to be an actual voter. Certain people do not vote as a matter of principle. This does not negate their constitutional right under *Reynolds*.

As Justice Thomas suggests, Defendants confuse the constitutional right with the reality of apportionment litigation. Upon a moment of reflection, it is clear there is little reason for someone who does not vote, much less fails to register, to file a redistricting challenge given the cost. The plaintiffs therefore tend to be activists, voting rights organizations, or political parties, all who know the game, as do their lawyers. They get plaintiffs from the most malapportioned areas as Judge Novak suggested. JA 091.

But this fact of lawsuit life in not part of the 14th Amendment. *Reynolds'* equal population principle only requires a plaintiff to reside in a district with unconstitutional dilution. Still, Justice Thomas does have a valid point: the Supreme Court might consider being more precise in its language.

### IX.   Candidate Standing

Plaintiff did briefly circulate petitions last year to get on the Democratic primary ballot for the nomination for delegate in House District 68. Affidavit of Plaintiff. Yet whether Plaintiff tried to run or not for delegate in 2021 is irrelevant. Plaintiff seeks his right to run in a constitutionally sound district this year as provided in *Cosner v Dalton*.

Until there is an election called for the new House District 78, Plaintiff cannot file a declaration of candidacy according to VA. Code Section 24.2-520. Defendants know this. Plaintiff is ready and willing to run in House District 78, qualified under state law, ready to get petitions and contact voters. He wants to run as a Democrat, as protected by the First Amendment. But Defendants are in effect fighting to keep him off the ballot. This gives him candidate standing. See *Favors v. Cuomo*, 866 F. Supp. 2d 176, 187 (E.D.N.Y. 2012) (three-judge court).

### X.   *Cosner* Relief is Appropriate

Virginians "are entitled to vote as soon as possible for their representatives under a constitutional apportionment plan." *Page v. Virginia State Board of Elections*, 58 F. Supp 3d 544, 559 (E.D. Va 2014). "No right is more precious in a free country…(o)ther rights, even the most basic, are illusory if the right to vote is undermined." *Williams v. Rhodes*, 393 U.S. 23 (1968). Thus the basic *Cosner v. Dalton* principle has been accepted.

## XI.   June 2022 Primary is Irrelevant

Defendants know there are no House of Delegates elections being conducted in June 2022. A primary can be set for late summer solely for the House of Delegates. This is not unusual in Virginia. See *Cosner*. Defendants' focus on the June primary is merely a diversionary tactic. Plaintiff filed his lawsuit long before a similar suit had been filed in 1981. The cases cited by Defendant are not germane to the election process this year in Virginia.

## XII.   Moot? Actually, Plaintiff's Particularized Constitutional Harm Grows Daily

In 2011, the General Assembly put Plaintiff into the old House District 68. They promised his vote would be equally weighted as required by *Reynolds* and its progeny. As lawmakers knew, the expected population shifts could make those old districts, where Plaintiff and others similarly situated lived, constitutionally questionable prior to the 2021 election.

Defendants, like Justice Thomas, agree the 14th Amendment contains the right to equal representation in state legislatures. But unlike Justice Thomas, they want to radically change the implementation – indeed the definition – of this right. Justice Thomas supported the *Harris* decision; indeed, it proved a rare unanimous decision. The 10% marker is sensible and basically embodies experience over the years.

Justice Thomas' problem with *Reynolds* only goes to the inflexible use of population as the only criteria for determining equal representation. Thomas agreed population deviations of 10% or more were constitutionally suspect, as did the entire *Harris* Court.

Defendants reject the views of every Supreme Court Justice apparently. Justice Thomas would not condone a 72.7% deviation. He would understand that population ratios of 1.27 to 1 between districts violates *Harris*. It is possible a state could convince him a 16.4% variance

25

might have been made in good faith. But not the more than 20% variance between Plaintiff's old district and the least populated district Defendants have now admitted.

Defendants advocate a legal position Justice Thomas would find so radical that it guts the equality of representation in in *Reynolds*. As shown *supra*, where Thomas sets a 10% marker, Defendants demand a 25.7% population deviation under a weird mathematical formula to suffer constitutional harm for standing. Indeed, as shown, their math is so confused an apportionment scheme could have a 57.1% maximum population deviation and yet be immune from suit by any Virginia plaintiff under Defendants' theory.

Justice Thomas and his eight colleagues in *Harris* unanimously rejected such thinking. There is no asterisk in their opinion, much less *Reynolds* saying equal representation does not apply to Plaintiff or those similarly situated because he happens to live in a district with less population than the ideal district, even if his vote is hugely diluted due to massive deviations between his district and those with far smaller numbers of inhabitants.

Defendants apparently believe that one's harm is determined by adding up the deviations from districts with less population and with more, and then seeing which number is higher. *Reynolds* does not endorse this type of math, nor has it ever been discussed in the last 58 years. Under Defendants' theory, the wildest deviations from one-person one-vote cannot inflict harm if the deviations to the downside balance off those to the upside.

*Reynolds* says the opposite: all individual districts need to be equal in population. It isn't a zero-sum analysis. The constitutional point is to make sure we all feel equally represented since this is consistent with the equality principle embedded in the Constitution. The fact others may have more or less harm does not make my harm any less constitutionally important.

Plaintiff has shown the mathematically calculated deviations considered as proving the required constitutionally prohibited individual vote dilution for purposes of standing in all other cases. Plaintiff may lose, for as *Harris* says, a state must be given a chance to factually prove they tried in good faith to do better. As *Reynolds* concedes, the ultimate decision will inevitably be an equitable one with each situation likely requiring a balancing of important interests.

Yet the math is clear: it took 1.27 votes in the old House District 68 to equal 1 vote in the old House District 75. Defendant conceded that Plaintiff, based on the ideal district population for the Census creating this seat, suffered a population deviation double the 10% marker in *Harris*, and roughly equal to what *Cosner* declared to be facially unconstitutional.

That is not speculative harm. It is continuing harm until constitutional districts have been used to elect a House of Delegates in which such vote ratios are not present. Until then, this particularized district-related harm, affecting the effectiveness of Plaintiff's vote, continues affording sufficient harm for standing in *Baker v. Carr* and its progeny.

According to Defendants, whatever constitutional harm Plaintiff may have suffered, indeed the nearly 1 million Virginians they concede were harmed have suffered, has been magically erased forever when the Supreme Court of Virginia on December 28, 2021, created new districts using the 2020 Census. This argument is hard to take seriously.

The Commissioner of Elections says Plaintiff now resides and is a registered voter in new House District 78. Who, then, is Plaintiff's representative in the House of Delegates? Neither Plaintiff nor others similarly situated voted for such a representative on November 2, 2021. Instead, 100 members of the House of Delegates who were elected from the old districts created

27

according to the 2010 Census will remain running that legislative body until 2024 if Defendants have their way.

To repeat: the same people elected from unconstitutional districts remain in power until the Plaintiff and others get to choose new members. As demonstrated, Plaintiff's vote was overweighted 1.27 to 1 in that facially unconstitutional scheme that will continue to dilute his vote until 2024. How has the creation of new districts on paper by the Supreme Court of Virginia changed that unconstitutional dynamic?

Do the math: the harm Plaintiff suffers, the harm Plaintiff suffers individually, exists because Plaintiff's vote was unconstitutionally diluted in choosing those now serving. Plaintiff's constitutional harm occurred on November 2, 2021. The harm remains and compounds every day until his right to have a representative to a constitutionally apportioned House of Delegates is provided.

Indeed, according to Defendants, the court in *Cosner v. Dalton* made a monumental era. According to Defendants' mootness argument, there was never a need for a 1982 special election in *Cosner*, since new constitutional districts were ordered to be enacted long before November of 1982, thus erasing the harm. This made the 1982 election unnecessary. Amazing how no one claimed that in 1982 or in any court case since, yet it is so clear to Defendants today.

Indeed, the "mootness" argument particularly should trouble this tribunal for the following obvious reason. Defendants claim the mootness happened last December 28, 2021. Yet they have said nothing until now. Thus, the 4th Circuit and now this Court have been wasting their time and resources, indeed Plaintiff was forced to spend considerable sums to submit proper

28

documents to the 4th Circuit last January, when apparently the case had been moot according to Defendants.

This matter is not moot: quite the opposite. The House of Delegates consists of 100 members elected pursuant to an apportionment scheme containing population deviations far in excess of those allowable in the leading federal cases. Until the membership of the body changes, the constitutional harm continues to compound, especially for Plaintiff, as his 1.27 to 1 vote dilution continues day after day, with each and every action of the House of Delegates.

## ORAL ARGUMENT IS NECESSARY

At the hearing on October 12, Judge Novak set Oral Argument on standing for November 8, 2021. JA 115. He knew it was necessary for a fair resolution of the matter. Defendants never objected. A hearing is more necessary now with the emergence of the most radical gutting of the *Reynolds* principle in modern Virginia history ever proposed by the Office of Attorney General. Defendants' mootness and other claims reveal a state government believing it is immune from federal court oversight despite violating the plain meaning of a federal case it tries but fails to distinguish. How could Defendants *not* be required to explain these arguments in a public forum?

## CONCLUSION

For the reasons stated herein, Plaintiff clearly has standing to sue, the three-judge court has sole jurisdiction in this matter, and oral argument needs to be set given Defendants' unprecedented legal theories about their role in defending the constitutional voting rights of Virginians. Defendants, albeit unwittingly, admitted the massive violation of voting rights for close to a million Virginians. Yet they believe they are above accountability in a federal court.

That is a dangerously radical proposition in the view of this Plaintiff.

Dated: April 18, 2022,                                    Respectfully submitted,

Paul Goldman
P.O. Box 17033
Richmond, Virginia 23226
804.833.6313
Goldmanusa@aol.com
*Pro se*

## CERTIFICATE OF SERVICE

THIS IS TO CERTIFY that on April 18, 2022, I filed the foregoing in paper form with the Clerk of Court. By previous arrangement, an electronic copy of this filing has been sent to:

Andrew N. Ferguson
Steven G. Popps

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7704 – Telephone
(804) 371-0200 – Facsimile

Paul Goldman
*Pro se* Plaintiff

31