IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

PAUL GOLDMAN,
    *Pro se* Plaintiff,

    v.                                             Civil No. 3:21cv420 (DJN)

ROBERT BRINK, *et al.*,
    Defendants.

## MEMORANDUM OPINION AND ORDER
### (Granting Motion to Dismiss)

David J. Novak, United States District Judge, wrote the opinion, in which Stephanie D. Thacker, United States Circuit Judge, and Raymond A. Jackson, Senior United States District Judge, joined.

This matter comes before the Court, sitting as a three-judge district court, on Defendants' Motion to Dismiss the Second Amended Complaint ("SAC" (ECF No. 18)) for Lack of Jurisdiction (Mot. (ECF No. 76)), following remand from the United States Court of Appeals for the Fourth Circuit for the limited purpose of determining whether *pro se* Plaintiff Paul Goldman ("Plaintiff") has standing to bring his Equal Protection Clause challenge to the 2021 Virginia election for the House of Delegates (Order of Remand (ECF No. 60)). The parties have fully briefed the issue, rendering the Motion ripe for resolution.[1]

Resolution of this Motion requires the Court to address two issues. First, should a single judge decide the issue of standing or should the three-judge court do so? Although a single judge alone clearly possesses the authority to address jurisdictional issues such as standing, we

---

[1] The Court dispenses with oral argument, because the materials before it adequately present the facts and legal contentions, and argument would not aid in the decisional process.

conclude that the three-judge panel collectively deciding the issue constitutes the most efficient process in the unique procedural posture that this case exists. Turning then to the ultimate question, we find that Plaintiff lacks standing both as a voter and as a prospective candidate to bring his challenge. Consequently, the Court hereby GRANTS the Motion to Dismiss.

## I.  STANDARD OF REVIEW

A motion made pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges a court's jurisdiction over the subject matter of the complaint. Fed. R. Civ. P. 12(b)(1). When a defendant makes a facial challenge to subject matter jurisdiction under Rule 12(b)(1) but does not dispute the jurisdictional facts in the complaint, a court will treat the motion similar to a motion made for failure to state a claim under Rule 12(b)(6) and accept only the facts alleged in the complaint as true. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009).

Alternatively, if the defendant disputes the jurisdictional facts in the complaint, "the Court may 'look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists.'" *Virginia v. United States*, 926 F. Supp. 537, 540 (E.D. Va. 1995) (quoting *Capitol Leasing Co. v. FDIC*, 999 F.2d 188, 191 (7th Cir.1993)); *see also Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982) (explaining that a court may go beyond factual allegations in the complaint for factual attacks on subject matter jurisdiction). By that same token, a court may consider evidence outside of the pleadings without converting the motion to one for summary judgment. *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999) (citation omitted). In either case, the plaintiff bears the burden of proof to preserve jurisdiction. *Id.* (citation omitted). Here, the dispositive facts are not in dispute, as the parties have filed a Stipulation of Facts that provides a sufficient evidentiary basis for resolution of the issue. (Stipulation of Facts ("Stipulation") (ECF

No. 73)).[2]  With these standards in mind, the Court now turns to the factual and procedural background giving rise to this case.

## II.   BACKGROUND

Plaintiff brings this action against Defendants Robert Brink ("Brink"), John O'Bannon ("O'Bannon"), Jamilah D. LeCruise ("LeCruise") ("the Board members") and Susan Beals ("Beals") (collectively, "Defendants"), alleging a violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  (SAC ¶¶ 55-67, 121-34.)[3]  Plaintiff claims that Virginia held an election in 2021 for the House of Delegates for districts based on outdated population data, thereby unconstitutionally diluting his vote.[4]  The current Motion to Dismiss follows a convoluted, months-long procedural history involving multiple complaints, motions to dismiss, motions to intervene, various hearings, as well as the appointment of a three-judge court and an interlocutory appeal to the Fourth Circuit Court of Appeals on sovereign

---

[2]   Plaintiff also improperly filed (without permission of the Court) a pleading entitled Notice of Additional Facts Relevant to Standing ("Notice" (ECF No. 72)), a Surrebuttal (ECF No. 85) and an Affidavit (Aff. of Pl. Paul Goldman ("Goldman Aff.") (ECF No. 81)), which the Court will not consider, except as noted.

[3]   When Plaintiff filed the SAC, he sued the then-Commissioner of the Virginia Department of Elections, Christopher Piper ("Piper").  (SAC at 1.)  Since Plaintiff filed the SAC, the 2021 general election took place, and voters elected Republican gubernatorial candidate Glenn Youngkin ("Governor Youngkin") as governor.  *2021 November General*, Va. Dep't of Elecs. (Dec. 8, 2021), https://results.elections.virginia.gov/vaelections/2021%20November%20General/Site/Statewide. html.  Due to the change in administration, Beals currently serves as the Commissioner of the Virginia Department of Elections.  (Defs.' Mem. at 4 n.1.)  Beals is automatically substituted for Piper as a party pursuant to Federal Rule of Civil Procedure 25(d).

[4]   The Court refers to the Virginia House of Delegates as "the House of Delegates" or "the House," and the legislative districts for that body as "House of Delegates Districts" or "House Districts."

immunity. This Section details the factual and procedural history that led to this point in the litigation, as it relates to the issues of the Court's composition and Plaintiff's standing.

### A.    Factual Background

#### 1.    The parties

Plaintiff resides in Richmond, Virginia. (SAC ¶ 55.) When he filed the SAC, Plaintiff was a qualified voter in House District 68, and he was "contemplating . . . run[ning] for the House of Delegates," once the state legislative maps were "constitutionally drawn." (SAC ¶¶ 57-58.) Since the commencement of this action, the Supreme Court of Virginia released updated congressional and state legislative maps. (Stipulation ¶ 9.) Plaintiff now resides in House District 78 under these new maps. (*See* Compl. at 1 (original *pro se* complaint form listing Plaintiff's address of record); Defs.' Mem. Ex. A ("Beals Decl.") ¶ 5 (ECF No. 77-1); Tr. of Status Hrg., March 21, 2022 ("Mar. 21 Hrg. Tr."), at 3:14-18 (Plaintiff informing the Court that he would run in District 78 under the new maps)); Final Order Establishing Voting Districts, *In re Decennial Redistricting Pursuant to the Const. of Va, art. II, §§ 6 to 6-A, and Va. Code § 30-399* (Va. Sup. Ct. Dec. 28, 2021).[5]

Plaintiff originally sued former Virginia Governor Ralph Northam, Brink, O'Bannon, LeCruise and Beals in their official capacities, as well as the Virginia State Board of Elections ("the Board"). The Court dismissed the Governor and the Board, leaving Brink, O'Bannon, LeCruise and Beals as the remaining Defendants. (Mem. Op. at 26, Oct. 12, 2021 ("Oct. 12 Mem. Op.") (ECF No. 40); Order at 1, Oct. 12, 2021 ("Oct. 12 Order") (ECF No. 41).)

---

[5]    Available at https://www.vacourts.gov/courts/scv/districting/redistricting_final.pdf (scroll to third page of order, click "SCV Final House of Delegates Map (interactive)," type "4414 Grove Avenue, Richmond, VA, USA" in "Search Address" box on upper left-hand side of map and search the address by clicking the looking-glass button on right-hand side of "Search Address" box or hitting enter).

The Board has its headquarters in Virginia and exists to ensure "legality and purity in all elections" and to "ensure that major risks to election integrity are . . . addressed as necessary to promote election uniformity, legality and purity." (SAC ¶ 66 (citing Va. Code. § 24.2-103(A).) Brink, O'Bannon and LeCruise ("the Board members") serve as the Chair, Vice Chair and Secretary of the Board, respectively.[6] (SAC ¶¶ 62-64.) As noted above, Beals serves as the Commissioner of the Virginia Department of Elections. (SAC ¶ 65.) The Virginia Department of Elections — which Plaintiff has not named as a defendant — functions as the Board's "operational arm" and carries out its duties. (SAC ¶ 67.) Brink, O'Bannon, LeCruise and Beals have their offices in Richmond, Virginia, and citizenship in Virginia. (SAC ¶¶ 62-65.)

### 2.   *The 2021 redistricting process*

By statute, the United States Secretary of Commerce was to deliver the apportionment reports from the 2020 Census to the President of the United States by December 31, 2020. (Stipulation ¶ 1.) The Secretary of Commerce did not deliver those reports to the President until April 26, 2021. (Stipulation ¶ 1.) The United States Census Bureau was statutorily required to deliver 2020 census data to the states for redistricting purposes by April 1, 2021. (Stipulation ¶ 2.) On February 12, 2021, however, the Census Bureau stated that it would not be able to deliver the data until as late as September 30, 2021. (Stipulation ¶ 2.)

On August 12, 2021, the United States Census Bureau released the 2020 Census data, and the Virginia Redistricting Commission ("the Commission") hired an outside consultant to perform significant reformatting of those files so that the Commission could use them to

---

[6]      The Board has five members:  Brink, the Chairman; O'Bannon, the Vice Chair; LeCruise, the Secretary; as well as Donald W. Merricks ("Merricks") and Angela Chiang ("Chiang"), two general Board members. SBE Board Members, Va. Dep't of Elecs., https://www.elections.virginia.gov/board/board-members/ (last visited Oct. 4, 2021).  Plaintiff does not name Merricks or Chiang as Defendants in the SAC.

draw district lines. (Stipulation ¶ 3.) On August 16, 2021, the Commission voted to begin the redistricting process on August 26, 2021, the date on which it anticipated that it would receive reformatted files from the outside consultant. (Stipulation ¶ 3.) On August 26, 2021, the consultant provided the Commission with the reformatted files. (Stipulation ¶ 5.) Between August 17, 2021, and October 20, 2021, the Commission met eighteen times to develop redistricting plans. (Stipulation ¶ 6.) On October 24, 2021, the responsibility for creating new electoral districts for the House of Delegates transferred from the Commission to the Supreme Court of Virginia pursuant to Article II, § 6-A of the Virginia Constitution, because the Commission had not presented plans for House of Delegates and Senate districts to the General Assembly by the statutory deadline. (Stipulation ¶ 7.) The 2021 House of Delegates election was held on November 2, 2021, based on the House of Delegates old electoral districts in place at that time. (Stipulation ¶ 8.) The Supreme Court of Virginia completed the congressional and state legislative redistricting plans on December 28, 2021. (Stipulation ¶ 9).

### 3. *The 2021 general election*

Virginia candidates seeking election in the November 2021 general election ("2021 Candidates") could begin collecting petition signatures to qualify as candidates after January 1, 2021. 2021 Candidates who planned to compete in primaries could begin filing their qualification paperwork on March 8, 2021, and the deadline to do so fell on March 25, 2021. (Stipulation ¶¶ 11-12.) Plaintiff did not file any required forms to qualify as a candidate for House of Delegates District 68 in 2021. (Stipulation ¶ 14.) Absentee voting in the 2021 Democratic primary for the House of Delegates, including District 68, began on March 20, 2021.

(Stipulation ¶ 13.)[7]  The 2021 Democratic primary for the House of Delegates, including District 68, was held on June 8, 2021.  (Stipulation ¶ 15.)  Absentee voting for the 2021 House of Delegates election began on September 18, 2021.  (Stipulation ¶ 19.)

### 4.    *The 2022 general election*

The 2022 Virginia general election will take place on November 8, 2022. (Stipulation ¶ 20.)  No House of Delegates general election is scheduled to take place in 2022.  (SAC ¶ 119.)  The next House of Delegates general election will occur in 2023. (SAC ¶ 119.)

Virginia candidates seeking to be elected in November 2022 ("2022 Candidates") could start collecting petition signatures to qualify as candidates after January 1, 2022. (Stipulation ¶ 21.)  2022 Candidates who intend to compete in primaries could begin filing their qualification paperwork on March 21, 2022, with a deadline of April 7, 2022. (Stipulation ¶¶ 22-23.)  Under federal and state law, absentee voting for the 2022 primary must begin no later than May 7, 2022.  (Stipulation ¶ 24.)

The statewide primary for the two major parties recognized by state law will take place on June 21, 2022.  (Stipulation ¶ 25.)  Pursuant to federal and state law, absentee voting for the November 2022 general election must begin no later than September 24, 2022.  (Stipulation ¶ 26.)  The House of Delegates has no primary or general election contests during 2022.  (Stipulation ¶ 27.)

---

[7]      Plaintiff never alleges whether he has or would seek election to the House as a Democrat (or any other party affiliation, for that matter).  However, he states in his Response to the Motion to Dismiss that he "briefly circulate[d] petitions [in 2021] to get on the Democratic primary ballot for the nomination for delegate in House District 68." (Resp. at 24.)

5.      *The apportionment of House of Delegates districts*

a.      *Apportionment of the population of Virginia, according to the 2010 census, among the House of Delegates districts defined in 2011*

According to the 2010 Census, Virginia had a total population of 8,001,024, making the average population (the "ideal population" or "ideal district") of the 100 House of Delegates districts 80,010. (Stipulation ¶ 28.) The House of Delegates districts defined by the General Assembly in 2011 and redrawn by this Court in 2019, *see Bethune-Hill v. Va. State Bd. of Elecs.*, 368 F. Supp. 3d 872 (E.D. Va. 2019), were apportioned using population data from the 2010 census. The Stipulation contains the 2010 Census Population for each district, including 2011 House District 68, which was 79,611. (Stipulation ¶ 29.)

b.      *Apportionment of the population of Virginia, according to the 2020 Census, among the House of Delegates districts defined in 2011*

According to the 2020 Census, the total population of Virginia grew to 8,631,393 (an increase of 7.9%), making the ideal House district population 86,314. (Stipulation ¶ 30.) Before the 2021 redistricting, the population of Virginia as ascertained by the 2020 Census was distributed among the 2011 House of Delegates districts (as redrawn by the District Court in 2019). (Stipulation ¶ 35.) Under this apportionment, when the 2021 general election occurred, Plaintiff's 2011 House district — District 68 — had a population of 85,344. (Stipulation ¶ 31.) The least populated 2011 House District, District 75, had a population of 67,404. (Stipulation ¶ 32.) The most populated 2011 House District, District 87, had a population of 130,192. (Stipulation ¶ 33.)

### c.   *Apportionment of the population of Virginia, according to the 2020 Census, among the House of Delegates districts defined in 2021*

The Supreme Court of Virginia apportioned the 100 House of Delegates districts defined by the Supreme Court of Virginia in 2021 using population data from the 2020 census. (Stipulation ¶ 39.)  2021 House District 78, where Plaintiff resides, has a population of 87,774, according to the 2020 Census.  (Stipulation ¶ 36.)  2021 House District 27 constitutes the least populated 2021 House district, with a population of 84,213.  (Stipulation ¶ 37.)  2021 House District 75 constitutes the most populated 2021 House district, with a population of 88,463.  (Stipulation ¶ 38.)

### B.   Procedural History

#### 1.   *Proceedings Regarding Defendants' First Motion to Dismiss the SAC*

On June 28, 2021, Plaintiff filed his original Complaint, alleging violations of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and Article II, §§ 6 and 6-A of the Virginia Constitution.  (Compl. ¶¶ 81-99.)  The Clerk assigned this case to United States District Judge David J. Novak.

On July 6, 2021, Plaintiff filed his First Amended Complaint.  ("FAC" (ECF No. 3).)  On August 3, 2021, Defendants moved to dismiss the FAC for lack of jurisdiction and failure to state a claim.  (Defs.' Mot. to Dismiss the FAC (ECF No. 12).)  In this Motion, Defendants challenged Plaintiff's standing.  (Defs.' Mem. in Supp. of Mot. to Dismiss the FAC at 4-8 (ECF No. 13).)

On September 7, 2021, Plaintiff moved for leave to amend his complaint a second time. (Mot. for Leave to File Am. Compl. at 1-2 (ECF No. 16).)  Three days later, on September 10, 2021, Judge Novak granted the Motion, and the Second Amended Complaint ("SAC") became the operative complaint in this action.  (Order at 1, Sept. 10, 2021 ("Sept. 10 Order") (ECF No. 17).)  Shortly thereafter, Plaintiff moved for an expedited hearing on the SAC.  (ECF No. 19.)

On September 14, 2021, Judge Novak denied Plaintiff's Motion for an Expedited Hearing, because there existed no pending motions on which to have a hearing.  (ECF No. 21.)

On September 23, 2021, Defendants filed their First Motion to Dismiss the SAC for lack of jurisdiction (1st Mot. to Dismiss SAC at 1-2 (ECF No. 23)), asserting that sovereign immunity shielded them from suit.  (Defs.' Mem. in Supp. of 1st Mot. to Dismiss the SAC at 5-11 (ECF No. 24)).  In their Memorandum in Support of the Motion to Dismiss the SAC, Defendants abandoned their previous challenge to Plaintiff's standing.

Due to the rapidly approaching House of Delegates election, Judge Novak ordered Plaintiff to respond to Defendants' First Motion to Dismiss the SAC by September 29, 2021.  (Order at 1, Sept. 24, 2021 ("Sept. 24 Order") (ECF No. 25).)  Additionally, Judge Novak ordered Defendants to file their Reply, if any, by October 4, 2021.  (Sept. 24 Order at 1.)  Plaintiff filed his Response a day late (ECF No. 27), and Defendants never replied.

On October 12, 2021, Judge Novak conducted a hearing on Defendants' First Motion to Dismiss the SAC.  (ECF No. 39.)  That same day, he granted the First Motion to Dismiss as to Plaintiff's claim under the Virginia Constitution as to all Defendants.  (Oct. 12 Order at 1; Oct. 12 Mem. Op. at 17.)  He also dismissed Plaintiff's federal claim against Governor Northam and the Board on sovereign immunity grounds.  (Oct. 12 Order at 1; Oct. 12 Mem. Op. at 17.)  Further, Judge Novak denied the Motion as to Plaintiff's federal claim against the remaining Election Officials, also on sovereign immunity grounds.  (Oct. 12 Order at 1; Oct. 12 Mem. Op. at 18-19.)  Additionally, given that the general election was mere weeks away, he ordered the remaining Defendants to notify the Court whether they intended to seek interlocutory review of the Order by October 18, 2021.  (Oct. 12 Order ¶ 1.)  Judge Novak further ordered that, if the

remaining Defendants chose to take an interlocutory appeal, then he would stay the case as

Defendants requested.  (Oct. 12 Order ¶ 1.)

During the hearing, Judge Novak also *sua sponte* raised the issue of Plaintiff's standing

to bring the lawsuit.[8]  Despite previously abandoning their standing challenge, Defendants orally

moved to dismiss the case based on Plaintiff's lack of standing.  (Oct. 12 Hr. Tr. at 19:8-20:17.)

As a result, Judge Novak set a schedule for the parties to brief whether Plaintiff had Article III

standing to pursue his claims.  (Oct. 12 Order ¶¶ 2-6.)

During the October 12 hearing, Judge Novak also informed the parties that he had

notified Chief Judge Roger L. Gregory of the United States Court of Appeals for the Fourth

Circuit of the possible need for a three-judge court pursuant to 28 U.S.C. § 2284, but he intended

to deal with the issue of standing first.  (Oct. 12 Hrg. Tr. at 16:20-24.)  The next day, Chief Judge

Gregory appointed a three-judge panel consisting of Judge Novak, the Honorable Stephanie D.

Thacker, United States Circuit Judge, and the Honorable Raymond A. Jackson, Senior United

States District Judge for the Eastern District of Virginia.  (ECF No. 44.)

### 2.      *The Interlocutory Appeal*

On October 18, 2021, before Judge Novak could address the standing issue, the

remaining Defendants noticed their appeal of Judge Novak's October 12 Order granting in part

and denying in part the First Motion to Dismiss.  (Notice of Appeal (ECF No. 47).)  Judge

Novak stayed the case pending disposition of the appeal, as Defendants requested.  (Order, Oct.

20, 2021 (ECF No. 49).)  On March 15, 2022, the Fourth Circuit ordered a limited remand to

"the district court" for it to "assess and resolve whether Goldman possesses Article III standing

---

[8]      A court must ensure that it has subject matter jurisdiction, and as such, may address
standing *sua sponte*.  *Buscemi v. Bell*, 964 F.3d 252, 258 (4th Cir. 2020).

to sue." (Order of Remand at 4.)  The Fourth Circuit "retain[ed] jurisdiction in this appeal," which was "stayed pending resolution of the remand proceedings." (Order of Remand at 4.)

### 3.    *Proceedings on Remand*

On March 21, 2022, Judge Novak held a hearing to schedule briefing on Plaintiff's Article III standing (ECF No. 68), and ordered the parties to file stipulations regarding the facts related to Plaintiff's standing by March 25, 2022. (Order ¶ 1, Mar. 21, 2022 ("Mar. 21 Order") (ECF No. 69).)  Further, he ordered Defendants to file a motion to dismiss for lack of jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).  (Mar. 21 Order ¶ 2.)  In their renewed motion to dismiss, Defendants were required to address three issues:  (1) whether Judge Novak alone or the three-judge panel should rule on standing under 28 U.S.C. § 2284; (2) whether Plaintiff has standing as a voter or as a candidate for the House of Delegates; and, (3) whether oral argument on standing would be necessary.  (Mar. 21 Order ¶ 2.)  The Order also required Plaintiff to respond by April 15, 2022, and Defendants to reply within six days of Plaintiff's response.  (Mar. 21 Order ¶¶ 3-4.)  Finally, Judge Novak prohibited the parties from filing any motions or pleadings other than those related to the renewed motion to dismiss, because the Fourth Circuit remanded the case solely to address standing and no other issues, while otherwise retaining jurisdiction over the case.  (Mar. 21 Order at 2.)[9]

---

[9]    In contravention of the Court's explicit instructions, Plaintiff proceeded to file no less than six pleadings and motions other than his Response.  (Notice of Additional Facts Relevant to Standing (ECF No. 72)); Goldman Aff. (ECF No. 81); 1st Mot. to Introduce Supplemental Authority (ECF No. 82); Mot. to Produce Records (ECF No. 83); Surrebuttal in Resp. to Defs.' Mot. to Dismiss (ECF No. 85); 2d Mot. to Introduce Supplemental Authority (ECF No. 87).)  In recognition of Plaintiff's *pro se* status, the Court granted his First Motion to Introduce Supplemental Authority (ECF No. 82).  However, because Plaintiff's Second Motion to Introduce Supplemental Authority concerned entirely irrelevant material, the Court struck it. (Order, May 5, 2022 (ECF No. 88).)  The Court will also deny as moot Plaintiff's Motion to Produce Records, which seeks to compel Defendants to produce Plaintiff's voter-history records

Four days later, on March 25, 2022, the parties filed their Stipulation of Facts.  (ECF No. 73.)  On April 1, 2022, Defendants filed their renewed Motion to Dismiss the SAC.  (ECF No. 76.)  After jointly requesting extensions, which the Court granted (ECF Nos. 78-79), Plaintiff responded on April 18, 2022 (ECF No. 80), and Defendants replied on April 25, 2022 (ECF No. 84), rendering the Motion ripe for review.

With this background in mind, the Court next addresses its composition and the pending Motion to Dismiss.

## III.   ANALYSIS

The Court will first address whether a single judge, Judge Novak, should decide the issue of standing or whether the three-judge court collectively should do so.  Thereafter, the Court will determine whether Plaintiff has standing as either a voter or as a candidate for the House of Delegates to proceed with his lawsuit.

### A.   Composition of the District Court

As a threshold matter, the parties disagree about who should decide the standing issue.  Section 2284(a) of Title 28 provides that a three-judge district court:

> shall be convened when otherwise required by Act of Congress, or when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body.

However, the statute permits "[a] single judge [to] conduct all proceedings except the trial, and enter all orders permitted by the rules of civil procedure" but prohibits him from "enter[ing] judgment on the merits."  § 2284(b)(3).  A three-judge panel need not adjudicate claims that "fail[] to raise a substantial federal question for jurisdictional

---

to show that he voted in the 2021 general election (ECF No. 83).  As discussed below, the Court will assume that Plaintiff voted in the 2021 House of Delegates general election.

purposes." *Shapiro v. McManus*, 577 U.S. 39, 45 (2015). Thus, a single judge may

review jurisdictional questions, without convening a three-judge panel. *Sharrow v. Fish*,

501 F. Supp 202, 205 (S.D.N.Y. 1980), *aff'd*, 659 F.2d 1062 (2d Cir. 1981).[10]

However, neither § 2284 nor the case law interpreting it *requires* a single judge to

address jurisdictional matters. *See Gonzalez*, 419 U.S. at 99-100 (noting that three-judge

district court dismissed the complaint for lack of standing, which a single judge could

have done alone). Even though a single judge could resolve the standing issue or any

other jurisdictional issue, expediency supports having the three-judge panel collectively

decide the issue here. This case has languished for far too long, largely due to

Defendants' efforts to engage in piecemeal litigation and Plaintiff's unorthodox (and

occasionally improper) filings. Any decision by a single judge would be subject to

further review by the three-judge panel collectively, thereby resulting in further briefing

and delay. 28 U.S.C. § 2284(b)(3) ("Any action of a single judge may be reviewed by

the full court at any time before final judgment."). And perhaps most importantly, the

three-judge panel is unanimous in its view on the ultimate issue as to whether Plaintiff

possesses standing. Consequently, although not required to do so, the District Court

comprised of Judges Thacker, Novak and Jackson will collectively decide this Motion.

## B.    Plaintiff's Article III Standing

Article III of the Constitution limits federal courts' jurisdictions to "Cases" and

"Controversies." U.S. Const. art. III § 2. To satisfy the case-or-controversy requirement

---

[10]    In cases where a three-judge court has not yet been convened, a single judge may decline
to convene a panel and decide jurisdictional issues himself. *Gonzalez v. Automatic Emps. Credit
Union*, 419 U.S. 90, 100 (1974). When the chief circuit judge has already appointed the panel,
the panel may dissolve itself and allow a single judge to handle jurisdiction. *Id.*

of Article III, Plaintiffs must establish standing to sue. *Lujan v. Defs. of Wildlife*, 504 U.S. 555,

560-61 (1992). To meet the minimum constitutional requirements for standing, an individual

plaintiff must establish three elements: (1) that the plaintiff has sustained an injury in fact;

(2) that the injury is traceable to the defendants' actions; and, (3) that the injury likely can be

redressed by a favorable judicial decision. *Friends of the Earth, Inc. v. Gaston Copper*

*Recycling Corp.*, 629 F.3d 387, 396 (4th Cir. 2011) (citing *Lujan*, 504 U.S. at 560-61).

This case rises and falls on the injury-in-fact requirement of Article III standing, as

explained below. To demonstrate an injury in fact, a plaintiff must suffer an invasion of a legally

protected interest that is concrete and particularized to him, as well as actual or

imminent. *Gaston Copper Recycling Corp,* 629 F.3d at 396 (citing *Lujan*, 504 U.S. at

560); *McBurney v. Cuccinelli*, 616 F.3d 393, 410 (4th Cir. 2010). Thus, a "generalized grievance

about the conduct of government" that is "plainly undifferentiated and common to all members

of the public" cannot confer standing. *United States v. Richardson*, 418 U.S. 166, 176-77 (1974)

(citations omitted).

### 1. *Voter Standing*

Defendants argue that Plaintiff lacks standing as a voter to pursue his Equal Protection

claim. (Defs.' Mem. at 12.) First, they argue that the Court should not accept Plaintiff's theory

that the House of Delegates districts drawn in 2011 became malapportioned by 2021 based on

the 2020 Census data, even for standing purposes. (Defs.' Mem. at 12.) But even if the Court

accepts Plaintiff's theory, they contend that he has failed to prove that he has standing because,

(1) he has neither alleged nor proven that he voted in the 2021 election, and, (2) even if he did

vote, he suffered no injury since his House of Delegates district was not malapportioned. (Defs.'

Mem. at 12-13.)

Plaintiff responds that he has standing, because the deviation between the most and least populated House of Delegates Districts exceeds 10%, which he deems a constitutional violation, and because failure to reapportion electoral maps every ten years "is 'constitutionally suspect.'" (Resp. at 15, 17.)  He also argues that he need not prove that he voted in the 2021 House of Delegates general election to have standing, because he only needs to allege that he constitutes a "qualified voter" to have standing.  (Resp. 17.)  According to Plaintiff, he has standing, simply because the deviation between the smallest and largest House of Delegates Districts falls above 10%.  (Resp. at 19-22.)

"It is without dispute that the right to vote is the most basic of political rights, such that the government's interference with that right may satisfy the injury-in-fact requirement." *Bishop v. Bartlett*, 575 F.3d 419, 424 (4th Cir. 2009) (internal citation and quotation marks omitted). "Thus, 'voters who allege facts showing disadvantage to themselves as individuals have standing to sue' to remedy that disadvantage." *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018).  That disadvantage may arise from dilution of their vote.

Under *Reynolds v. Sims*, "the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis." 377 U.S. 533, 568 (1964).  "[A] state [must] make an honest and good faith effort to construct districts . . . as nearly of equal population as is practicable." *Id.*  The right to vote is "individual and personal in nature." *Id.* at 561.  For that reason, "an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living on other parts of the State." *Id.* at 568 (emphasis added)).

By extension, only those who "allege facts showing disadvantage to themselves as individuals have standing to sue" to remedy that disadvantage. *Baker v. Carr*, 369 U.S. 186, 206

(1962).  As the Supreme Court recently clarified, plaintiffs in vote-dilution cases must demonstrate that their "injury is district specific," meaning that their injury "arises from the particular composition of [their] own district, which causes his vote . . . to carry less weight than it would carry in another, hypothetical district." *Gill*, 138 S. Ct. at 1930-31 (cleaned up) (quoting *Baker*, 369 U.S. at 206).  For that reason, "a voter from a district that is overpopulated and underrepresented suffers an injury-in-fact," while "a voter who resides in an underpopulated district cannot properly allege an injury-in-fact." *Hancock Cnty. Bd. of Supervisors v. Ruhr*, 487 Fed. App'x 189, 196 (5th Cir. 2012) (first citing *Baker*, 369 U.S. at 205-06; then citing *Reynolds*, 377 U.S. at 568; and then citing *Fairley v. Patterson*, 493 F.2d 598, 603 (5th Cir. 1974)). Moreover, allowing a plaintiff in an overrepresented district to sue for underrepresentation would contravene the Supreme Court's instruction that "a plaintiff's remedy must be limited to the inadequacy that produced his injury in fact." *Gill*, 138 S. Ct. at 1930.

The Fourth Circuit has not squarely addressed whether a voter residing in an overrepresented district possesses standing to pursue one-person-one-vote claims.  However, the circuits that have faced this issue have held that overrepresented voters lack standing to pursue an apportionment challenge. *Garcia v. 2011 Legislative Reapportionment Comm'n*, 559 F. App'x 128, 133 (3d Cir. 2014) ("Malapportionment's harm is felt by individuals in overpopulated districts who actually suffer a diminution in the efficacy of their votes and their proportional voice in the legislature. . . . To challenge a state's apportionment scheme, therefore, an individual must belong to the injured class of people whose votes and representational voice receive less than their fair share."); *Wright v. Dougherty Cnty.*, 358 F.3d 1352, 1356 (11th Cir. 2004) (per curiam) ("(1) [O]nly persons residing in underrepresented districts have standing for only they fulfill the three prong test of 'injury in fact,' and (2) an over-represented (aka

17

uninjured) person may not bring suit on behalf of persons who are underrepresented." (quoting *Fairley*, 493 F.2d at 604-04)); *League of Women Voters v. Nassau Cnty. Bd. of Supervisors*, 737 F.2d 155, 162 (2d Cir. 1984) ("Persons [who are not] domiciled in *underrepresented* voting districts lack standing [in apportionment challenges]." (citation omitted) (cleaned up)); *Fairley*, 493 F.2d at 603 ("[I]njury results only to those persons domiciled in the under-represented voting districts."); *Skolnick v. Bd. of Comm'rs*, 435 F.2d 361, 364 (7th Cir. 1970) (holding that plaintiffs who lived in overrepresented districts lacked standing).

### a.     *The Court will assume that Plaintiff voted in the November 2021 election.*

First, as a threshold matter, the Court will assume that Plaintiff voted in the November 2021 House of Delegates election for standing purposes, despite the dearth of allegations and Plaintiff's nebulous assertions on this point.  Plaintiff claims that Defendants knew or should have known whether he voted in the 2021 election, because the state Department of Elections has his voter history in its "unique possession."  (Resp. at 22.)  Defendants explain that they could not disclose or stipulate to Plaintiff's voter history, as state law prohibits the Department of Elections from voluntarily disclosing voter-history information except to certain entities.  (Reply at 4 n.3 (quoting Va. Code § 24.2-406(A)).)  All registered voters in Virginia have access to their voter-history record for free through the Department of Elections website.  (Reply at 4 n.3.)

Plaintiff never alleges nor properly provides evidence to show that he voted.  In the SAC, he alleges that he merely constituted a "qualified voter" in 2011 House of Delegates District 68. (SAC ¶ 56.)  During the October 12 hearing, Plaintiff claimed that he intended to vote in the November 2021 election.  (Oct. 12 Hrg. Tr. at 13:5-9.)  On remand, after the November 2021 election took place, Defendants repeatedly offered to stipulate that Plaintiff voted if Plaintiff provided them with evidence that he did so, such as his online voter record.  (Reply at 4 n.3.)

Despite having free, easy access to this record through the Virginia Department of Elections portal, Plaintiff refused to provide the record, leaving Defendants unable to stipulate to whether Plaintiff voted. (Reply at 4 n.3.)[11]  Additionally, at no point in his Notice of Additional Facts Relevant to Standing does Plaintiff assert that he voted in the November 2021 election. (Notice (ECF No. 72).)[12]

Plaintiff bears the burden of proving that he has standing, but he has not properly supported his assertion that he voted in November 2021. *See Lujan*, 504 U.S. at 561 (holding that the party invoking federal jurisdiction bears the burden of establishing the elements of standing). If Plaintiff did not vote in November 2021, he lacks standing, as he cannot claim injury to a right that he voluntarily failed to exercise. *Cf. Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) (holding that injury must be concrete, meaning "real, and not abstract" (citation

---

[11]     Not only did Plaintiff refuse to provide his voter history record, but he also moved to compel Defendants to disclose his voter history record, which Defendants legally cannot do. (Mot. to Produce Records (ECF No. 83).) He has offered no excuse for his refusal to provide his voter history record despite bearing the burden of establishing his standing.

[12]     Plaintiff relies on the concurrence of Justice Clarence Thomas in *Evenwel v. Abbott*, 578 U.S. 54 (2016), to argue that his "status as a voter" lacks relevance to his standing. (Resp. at 23.) Aside from the fact that this concurring opinion does not bind this Court, this concurrence lacks relevance. In his concurrence, Justice Thomas argued that the Constitution does not require adherence to the one-person-one-vote principle. *Evenwel*, 578 U.S. at 75-76. As Plaintiff points out, Justice Thomas explained that "the Court has suggested that one-person, one-vote protects the interests of *all* individuals in a district, whether they are eligible voters or not." *Id.* at 79-80. But Plaintiff takes this comment to mean that individuals do not need to vote — or even be eligible voters — to have standing in malapportionment challenges. (Resp. at 22-23.) This interpretation is incorrect. Justice Thomas's concurrence merely expresses the view that courts have generated confusion regarding how to correctly determine and resolve malapportionment. *Id.* at 79-80. He explains that, in malapportionment cases, courts typically use the total population — not the total number of voters — per legislative district to determine compliance with the one-person-one-vote principle, despite the principle's "aspiration of giving equal treatment to eligible *voters*." *Id.* at 79. The concurrence does not remark upon the requirements for standing in malapportionment cases and does not support Plaintiff's arguments.

omitted) (cleaned up)); *Lujan*, 504 U.S. at 560 n.1 (holding that the Article III requires a particularized injury, meaning one that "affect[s] the plaintiff in a personal and individual way").

However, despite the lack of a stipulation on this point and Plaintiff's refusal to provide his voter records, Plaintiff did file a document entitled Affidavit of Plaintiff Paul Goldman in which he swears under penalty of perjury that he voted in his "assigned precinct in the old House District 68 in the November 2, 2021 general election." (Goldman Aff. ¶ 8.) Although this document was improperly filed with the Court, we will accept his sworn statement and assume that Plaintiff voted in the challenged election.

> **b.** **Plaintiff lacks standing, because he has failed to prove that he suffered an injury in fact to his right to vote.**

Assuming that he did vote in the 2021 House of Delegates general election, Plaintiff has nonetheless failed to demonstrate a cognizable injury as a voter. In particular, he has not shown that he has suffered individualized disadvantage due to residing in an underrepresented House of Delegates District. *See Wright*, 358 F.3d at 1356 (explaining that overrepresented voters lack standing in malapportionment cases). To determine whether a plaintiff suffered from underrepresentation or benefited from overrepresentation in a malapportionment case, a court must measure the extent to which the plaintiff's district deviates from the hypothetical "ideal" district. *See, e.g.*, *Brown v. Thomson*, 462 U.S. 835, 838-39 (1983) (calculating the ideal district); *see also Gill*, 138 S. Ct. at 1931 ("That harm [that vote dilution causes] arises from the particular composition of the voter's own district, which causes his vote . . . to carry less weight than it would in another, hypothetical district."). The ideal apportionment of state legislative districts constitutes the state's total population divided by the number of legislative districts. *See Brown*, 462 U.S. at 838-39 ("The 1980 census placed Wyoming's population at 469,557. The statute provided for 64 representatives, meaning that the ideal apportionment would be 7,337

persons per representative."). This formula yields the population of each legislative district if the districts were equally populated. *Cf. Reynolds*, 377 U.S. at 577 (requiring that states make "an honest and good faith effort" to create state legislative districts with as close to equal population "as is practicable").

The 2020 Census data show that Virginia had a population of 8,631,393, once adjusted for the prisoner population. (Stipulation ¶ 30.)  Virginia has 100 House of Delegates districts, making the ideal district population 86,314.  (Stipulation ¶ 30.)  Plaintiff's House of Delegates District, District 68, had an adjusted population of 85,344.  (Stipulation ¶ 31.)  Plaintiff's District, therefore, contained approximately 1.12% fewer people than the ideal at the time of the 2021 general election.  Simply put, Plaintiff *benefited* from *over*representation during the November 2021 election for the House of Delegates.

In fact, had the new maps been in place in time for the election, they would have weakened Plaintiff's vote.  Under the new House of Delegates district maps, Plaintiff resides in District 78.  (Beals Decl. ¶ 5.)  That District, according to the 2020 Census data, has a population of 87,774 — a population approximately 2.77% larger than the population of 2011 District 68, where Plaintiff resided at the time of the 2021 election.  (Stipulation ¶ 36.)  Moreover, District 78's population is approximately 1.69% greater than the ideal district population.  (Stipulation ¶ 36.)  The off-cycle election that Plaintiff seeks would not inure to his benefit, as the new apportionment of Plaintiff's District slightly *dilutes* his vote.  (Stipulation ¶ 36.)

Plaintiff's claim to voter standing fails, because his theory of standing rests on the population variances between districts other than his own.  His theory essentially boils down to two points: (1) the "maximum percentage variance" between the largest and smallest districts exceeded 10%, which Plaintiff claims falls above constitutional limits, and (2) some districts had

a much smaller population than District 68 and were, therefore, even more overrepresented than that District. (SAC ¶¶ 37-45.)  Neither of these arguments demonstrate that Plaintiff, as a resident of District 68, suffered from the dilution of his own vote and individualized harm to his "proportional voice in the legislature." *Garcia*, 559 Fed. App'x at 133.

The first argument, regarding the maximum variance between the largest and smallest House districts, constitutes a "generalized grievance about the conduct of government" that is "plainly undifferentiated and common to all members of the public" and cannot confer standing. *Richardson*, 418 U.S. at 176–77 (quotation marks omitted).  All voters in the 2021 House of Delegates general election participated in an election in which the largest and smallest House districts bore a marked deviation.  The presence of such a deviation alone cannot give Plaintiff standing.  He must demonstrate that Defendants' actions diluted his *own* vote, as a voter in erstwhile District 68.  As discussed above, the opposite occurred — Plaintiff benefited from overrepresentation of his vote during the 2021 House election.  Plaintiff's maximum variance test that looks to districts other than his own may speak to the merits of his claim, but it bears no relevance to the question of whether he has suffered an individualized injury in the form of a diluted vote.[13]

---

[13]     Importantly, the cases that Plaintiff cites in support of this argument, *Reynolds* and *Baker*, do not support his theory.  In both of those cases, the plaintiffs suffered individualized harm to their own vote, because they lived in relatively overpopulated and politically underrepresented districts. *See* Br. of Appellant at 9-10, *Baker v. Carr*, 369 U.S. 186 (1962) (No. 6), 1961 WL 101846 (noting that the districts comprising Shelby, Davidson, Knox and Hamilton counties were massively underrepresented in the Tennessee legislature); *Sims v. Frink*, 208 F. Supp. 431, 432 (M.D. Ala. 1962) (noting that plaintiffs resided in Jefferson and Mobile counties); *id.* at 448, app. D; 450, app. E (data demonstrating that the populations of the state house and senate districts encompassing Jefferson and Mobile counties exceeded the ideal district size), *aff'd*, *Reynolds*, 377 U.S. 533.

As to the second argument, Plaintiff cannot cherry-pick districts that benefitted from even more overrepresentation than District 68 to support his claim to standing. (*See* SAC ¶¶ 45, 88 (arguing that, because District 68 had a smaller population than District 3, Plaintiff has standing).) To determine whether a voter has standing to pursue a malapportionment claim, courts must compare the population of a plaintiff's district to that of the hypothetical ideal district. *Gill*, 138 S. Ct. at 1931. Voters who live in districts with populations larger than the ideal district likely have standing, because they are underrepresented when compared to the ideal. *Garcia*, 559 Fed. App'x at 133. Conversely, voters in districts with populations smaller than the ideal lack standing, because they benefit from overrepresentation. *Id.* As previously explained, Plaintiff falls into the second category. Consequently, he did not suffer a particularized injury in fact that would furnish him standing to pursue this case as a voter.

### 2.   *Candidate Standing*

Plaintiff has also asserted standing to pursue this malapportionment challenge as a candidate. Reading the SAC liberally, it appears that Plaintiff makes only two allegations regarding candidate standing. First, Plaintiff alleges that he "was denied his right to run in a constitutionally drawn 68th district in 2021 and is contemplating using his core political rights guaranteed by the U.S. Constitution to run for the House of Delegates in a constitutionally drawn 68th district (or whatever the number of the district wherein he would reside)." (SAC ¶ 57.) Second, Plaintiff alleges that his "protected core First Amendment rights should allow him to run for the House of Delegates in 2022, should he so choose, instead of being forced to wait until 2023 due to the failure of the appropriate state authorities to adhere to the requirements of the federal constitutions (*sic*)." (SAC ¶ 128.)

Defendants claim that Plaintiff lacks standing as a candidate, because candidates cannot claim a legally cognizable injury from malapportionment, and even if they could, Plaintiff has not established the requisite intent to run for the House of Delegates. (Defs.' Mem. at 27.) Plaintiff responds that he did briefly circulate petitions in 2021 to appear on the Democratic primary ballot for House of Delegates District 68, but whether he sought to run in 2021 lacks relevance to his standing to sue as a candidate. (Resp. at 24.) He explains that, while he "is ready and willing to run in [the new] House District 78, qualified under state law," as a Democrat, he cannot file a declaration of candidacy until the Court grants his requested relief — ordering Defendants to call a House of Delegates election in 2022. (Resp. at 24.)

### a. *As a state legislative candidate, Plaintiff lacks sufficient injury for standing from malapportionment.*

A legislative candidate cannot suffer an injury from malapportionment for standing purposes, because "[a] legislator, or potential legislator, has 'no legally cognizable interest in the composition of the district he or she represents.' . . . 'While the voters in a representative's district have an interest in being represented, a representative has no like interest in representing any particular constituency.'" *Toth v. Chapman*, 2022 WL 821175, at *10 (M.D. Pa. Mar. 16, 2022) (citations omitted).

Of course, candidates can show an injury in fact and possess Article III standing in some instances, such as when a candidate or his party demonstrate that a defendant's actions have harmed the candidate's chances of winning. *See, e.g., Nelson v. Warner*, 472 F. Supp. 3d 297, 302, 304-05 (S.D. W.Va. 2020) (finding that state legislative candidate possessed standing to challenge statute mandating that ballots for partisan office list the party whose presidential candidate received the most votes in the last presidential election first), *aff'd in relevant part and rev'd on other grounds*, 12 F.4th 376 (4th Cir. 2021); *Green Party of Tenn. v. Hargett*, 767 F.3d

533, 544 (6th Cir. 2014) (holding that political parties had standing to challenge Tennessee's

ballot access and ballot order statutes); *Drake v. Obama*, 664 F.3d 774, 783 (9th Cir. 2011)

(holding that political candidates had "competitive standing," because "the 'potential loss of an

election' was an injury-in-fact"); *Tex. Democratic Party v. Bekiser*, 459 F.3d 582, 587-88 (5th

Cir. 2006) (holding that "harm to election prospects" and "threatened loss of political power"

sufficed to furnish a political party standing).

As Defendants correctly point out, Plaintiff has not alleged a theory of competitor

standing.  Plaintiff has not alleged that Defendants took any action that made it more difficult for

him to appear on the ballot.  Nor has he alleged that Defendants diminished his chances of

winning an election.  Instead, he alleges that Defendants denied him "his right to run in [the]

constitutionally drawn" House of Delegates District where he resides (SAC ¶ 57), and that the

First and Fourteenth Amendments entitle him to "run for the House of Delegates in 2022, should

he so choose, instead of being forced to wait until 2023 due to the failure of the appropriate state

authorities to adhere to the requirements of the federal constitutions (*sic*)."  (SAC ¶ 128.)[14]

Essentially, Plaintiff's candidate-standing theory fails, because it replicates his voter-

standing theory.  Plaintiff argues, both as a candidate and a voter, that holding the 2021 House of

Delegates election using old electoral maps violated the Fourteenth Amendment, and that

Defendants must call an off-cycle House of Delegates election in 2022 under the newly drawn

maps to remedy the violation.  (SAC ¶¶ 57, 122-23, 128.)  However, Plaintiff has no legally

---

[14]     Plaintiff insinuates that he has a First Amendment right to an off-cycle House of
Delegates election in the SAC, but never develops this assertion.  During the October 12 hearing,
the Court asked Plaintiff if he intended to bring a First Amendment claim in addition to his
Fourteenth Amendment claim.  (Oct. 12 Hrg. Tr. at 28:9-29:17.)  Plaintiff clarified that he
intended to assert claims only under the Fourteenth Amendment and had no First Amendment
claims.  (Oct. 12 Hrg. Tr. at 28:9-29:17.)

cognizable interest in representing a particular House of Delegates District as a candidate. Therefore, he lacks standing to pursue a malapportionment claim on that ground.[15]

> **b.**    ***Even if he could assert standing as a candidate, Plaintiff has not alleged facts to demonstrate a legally cognizable injury.***

Moreover, even if political candidates could suffer an injury in fact from malapportionment, Plaintiff has not alleged facts sufficient to demonstrate a cognizable injury, as he has not shown that he intends or intended to run for the House of Delegates.  The Supreme Court recently clarified that, to have candidate standing, a plaintiff "must at least show that he is likely to [run] in the reasonably foreseeable future," meaning that he "is 'able and ready' to do so."  *Carney v. Adams*, 141 S. Ct. 493, 499-500 (2020) (citing *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003); *N.E. Fla. Chapter, Associated Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 666 (1993)).  A "few words of general intent [to run,] without more and against all contrary evidence," do not suffice.  *Id.* at 501.  "[W]ithout prior [candidate] applications, without prior relevant conversations, without efforts to determine likely openings, without other preparations or investigations, and without any other supporting evidence," words of general intent cannot give rise to standing.  *Id.*

Here, Plaintiff has provided only words of general intent regarding his candidacy for the House of Delegates.  In his Response, Plaintiff argues that he "is ready and willing to run in [new] House District 78."  (Resp. at 24.)  However, the SAC alleges sparse facts regarding Plaintiff's past or current plans to run.  Plaintiff vaguely alleges that he had been "contemplating" running for a seat in the House of Delegates, but only if the House districts

---

[15]    Even if a candidate could establish standing by alleging a malapportionment injury, such an injury would presumably require the candidate to establish a malapportioned district.  As discussed above, Plaintiff cannot establish that he sought to represent an underrepresented district.

were "constitutionally drawn." (SAC ¶ 57.)  Plaintiff never alleges facts showing a definite

intent to run in the off-cycle House election that he proposes (or any other House election, for

that matter). (*See also* SAC ¶ 128 (asserting that he should have the opportunity "to run for the

House of Delegates in 2022, *should he so choose*").)

The Court can consider only the SAC and the Stipulation to address the instant Motion,

but it is worth looking beyond these documents to illustrate that Plaintiff has never committed to

run throughout this lawsuit.  During the October 12 hearing, he stated that he might run for the

House of Delegates, depending on his chances of winning under the new electoral maps, which

had not yet been created. (Oct. 12 Hrg. Tr. at 13:10-21 ("Depends on the district. . . . [It] could

make a big difference which way you go. . . . [I]t can go [R]epublican and you can't win or you

can go towards the [D]emocratic city and you can win.").)

Given this confusion, Judge Novak sought to clarify whether Plaintiff intended to run for

the House of Delegates during the March 21 hearing. (Mar. 21 Hrg. Tr. at 3:14-19.)  By that

point, the Virginia Supreme Court had released the new maps. (Stipulation ¶¶ 7, 9.)  Plaintiff

explained that he did, in fact, intend to run in House District 78:

> THE COURT:  So you now know what the Supreme Court's districts are.
> So knowing now how it's been drafted, you're saying you intend to run in
> the new district that the Virginia Supreme Court has approved?
>
> [PLAINTIFF]:  In the 78th District.  Unfortunately, there's no election
> called yet.

(Mar. 21 Hrg. Tr. at 3:14-19.)  As reflected above, Plaintiff did not specify *when* he intended to

run in House District 78.  The Court presumes, based on the SAC, that Plaintiff meant that he

planned to run in that district in 2022, if the Court were to order an off-cycle election to occur in 2022.[16]

After the March 21 hearing, Plaintiff filed a Notice of Additional Facts, seemingly to elucidate his plans to run for the House of Delegates. In his Notice, Plaintiff avers that he began to collect signatures to run in the Democratic primary for House of Delegates District 68 in March 2021, but he stopped seeking the nomination to focus on his run for Lieutenant Governor instead. (Notice ¶¶ 11-15.) He also notes that he cannot currently prepare to run in House of Delegates District 78, such as by declaring his candidacy or collecting signatures, because an election has not yet been called. (Notice ¶¶ 22-23.) Finally, he reiterates that he "meets all the qualifications necessary to run for the House of Delegates." (Notice ¶ 24.)[17]

At bottom, Plaintiff's allegations in the SAC fall far short of what the Supreme Court has deemed necessary for candidate standing. *See Adams*, 141 S. Ct. at 501 (explaining requirements for candidate standing). Plaintiff contends that the 2021 House of Delegates general election violated the Fourteen Amendment, because it was held using outdated maps. (SAC ¶¶ 121-34.) However, he has neither alleged nor proved that he ran as a candidate in the 2021 House of Delegates general election.[18] His statement that he merely "contemplat[ed]" running in a future

---

[16]    To further clarify Plaintiff's intentions regarding his potential candidacy for the House of Delegates, during the March 21 hearing, Judge Novak instructed the parties that they should stipulate to the House District in which Plaintiff intends to run. (Mar. 21 Hrg. Tr. at 11:18-21.) The parties' Stipulation lacked any facts about Plaintiff's plans to run.

[17]    As noted above, the Court cannot consider the facts that Plaintiff sets forth in his Notice. The Court highlights them here only as background, but does not treat them with any legal significance in its standing analysis. To be clear, though, even if the Court could consider the facts in the Notice, it would still grant the Motion to Dismiss.

[18]    In fact, as previously explained, Plaintiff abandoned his 2021 run for the House of Delegates before the primary even began. (Notice ¶¶ 11-21.) Because Plaintiff never alleged this fact and only included it in his Notice of Additional Facts, the Court cannot weigh it with

election constitutes textbook "words of general intent" that cannot give rise to standing on their own. (SAC ¶ 57); *Carney*, 141 S. Ct. at 501.

Moreover, as Defendants aptly highlight, Plaintiff's candidate standing theory seems to rest on an alternative, faulty premise. (Defs.' Mem. at 30.) Plaintiff claims candidate standing on the ground that, if the Court granted his requested relief — ordering an off-cycle House of Delegates election in 2022 — he might run in that election. (*See* SAC ¶¶ 57 (alleging that Plaintiff is "contemplating" running in a "constitutionally drawn" House District), 128 (asserting that he is constitutionally entitled to run for the House in 2022, "should he so choose").) Notwithstanding the speculative and noncommittal nature of this assertion, this theory conflates Plaintiff's claimed injury and proposed remedy. Plaintiff asserts that the *2021* House of Delegates general election violated the Fourteenth Amendment and requests that the Court order an election for the House in *2022* to address the violation. (SAC ¶¶ 45, 121-34.) Plaintiff's interest in running for the House in a hypothetical 2022 election bears no relevance to whether the 2021 election contravened the Equal Protection Clause. And, even if it did, Plaintiff still has not demonstrated that he is ready and able to run in District 78. Rather, he has merely "contemplat[ed]" a future run. (SAC ¶ 57). For these reasons, Plaintiff lacks standing as a candidate to pursue this matter.

Finally, the case that Plaintiff cites to bolster his theory of candidate standing, *Favors v. Cuomo*, 866 F. Supp. 2d 176 (E.D.N.Y. 2011), does not support his arguments. There, the plaintiffs were registered voters in the State of New York, and one of the plaintiffs was also a prospective candidate for the federal House of Representatives. *Favors*, 866 F. Supp. 2d at 179.

---

any legal significance. But, nonetheless, it provides helpful background that illustrates that Plaintiff's actions would erase his claim to candidate standing.

They alleged that the existing state and congressional maps "[were] unconstitutional due to population changes reflected in the 2010 census results and that the state's legislative redistricting process [was] at an impasse." *Id.* When it appeared that the state's legislative redistricting body would not issue updated maps in compliance with upcoming court-ordered deadlines, the plaintiffs sued to challenge the existing maps under the federal and state constitutions. *Id.* at 181. The plaintiffs sought a judicial order drawing new maps on the ground that "candidates and the public allegedly [had] been hampered in their ability to prepare for the upcoming elections." *Id.* One of the voter-plaintiffs also sought to run for Congress, but he had no way of knowing the district in which he would reside or the identity of his prospective voters until new districts were drawn. *Id.* at 187.

As Defendants point out, Plaintiff's case bears a key difference from *Favors* that renders it inapposite to his candidate standing theory. The prospective candidate in *Favors* did not allege an injury due to the malapportionment of his congressional district. Instead, the court determined the candidate's injury resulted from his lack of access to information about his district and the district of his prospective voters, which prevented him from collecting signatures to get on the ballot and campaigning. *Id.* By contrast, Plaintiff's alleged injury as a candidate does not stem from any uncertainty regarding the contours of his district. He knew the contours of the district in the 2021 election, and he knows the contours of the district in the 2023 election. Instead, he alleges that his injury results from the alleged vote dilution that occurred during the 2021 House of Delegates election due to the outdated electoral maps. (SAC ¶¶ 57, 128.) And, as discussed above, a candidate cannot claim vote dilution as an injury for standing purposes in a malapportionment case, because legislators and candidates have no cognizable interest in the composition of their districts. *See Toth*, 2022 WL 821175, at *9-10 (explaining requirements for

candidate standing).  For these reasons, Plaintiff lacks standing not only as a voter, but also as a candidate for the House of Delegates.[19]

## IV.    CONCLUSION

For the reasons set forth above, the Court hereby GRANTS Defendants' Motion to Dismiss (ECF No. 76) and DISMISSES WITH PREJUDICE this case.  This case is now CLOSED.

Let the Clerk file a copy of this Memorandum Opinion and Order electronically and notify all counsel of record and *pro se* Plaintiff.

It is so ORDERED.

_____/s/_____

David J. Novak
United States District Judge,
*on behalf and with the agreement of*
*Stephanie D. Thacker, United States*
*Circuit Judge, and Raymond A. Jackson,*
*Senior United States District Judge*

Richmond, Virginia
Date:  June 6, 2022

---

[19]     Because Plaintiff has failed to establish his standing, the Court need not address Defendants' other arguments, including mootness. (Defs.' Mem. at 23-28.)  Likewise, because no case or controversy exists at this point, the Court DENIES AS MOOT Plaintiff's Motion to Produce Records (ECF No. 83) and Jeffrey Thomas, Jr.'s Motion to Intervene (ECF No. 45). The Court advises Mr. Thomas that, if he elects to file his own lawsuit in this district involving the same issues in this case, he must indicate at the time of filing that his case is related to the instant case, consistent with the Court's related case procedures.